LOUISA C. PURSLEY, as Administratrix, etc., of CHARLES S. PURSLEY, Deceased, Respondent, v. EDGE MOOR BRIDGE WORKS, Appellant, Impleaded with JOHN C. RODGERS.

*Negligence — injury while working under a scaffold being constructed for the erection of a bridge — liability of the master — chapter 415 of 1897 has reference to a completed scaffold only — competency of testimony of experts as to the safety of piles under the scaffold and its braces — a party's objection to incompetent evidence not waived by his own introduction of like evidence.*

In an action brought to recover damages resulting from the death of an employee of the defendant in consequence of the collapse of a portion of a partially completed scaffold of false work, which the defendant was constructing preparatory to building a bridge over the Harlem river, while a traveling crane or derrick was resting thereon, the plaintiff contended that the piles upon which the false work was constructed were not properly driven and that sufficient X braces and cleats were not supplied in the portion of the structure which collapsed, and that the act of the defendant in running the traveler or crane thereon was negligent. At the time of the accident the intestate was at

work in a boat below the scaffold, and so far as appeared he was not familiar with the principles or methods of its construction.

*Held*, that the intestate was not chargeable, as matter of law, with knowledge of the condition of the piles, which were for the most part concealed in water and earth, and with the driving of which he had nothing to do, nor with knowledge of the effect of the presence or absence of particular braces in the structure;

That if the plaintiff's contention was correct, the accident did not result from the negligence of a co-employee in the performance of a mere detail of the work intrusted to him for which the master was not responsible;

That the structure in question, not being inherently dangerous and, if properly erected, being capable of affording a safe place in which the employee could work, the case did not come within the rule that a master may employ workmen in a hazardous undertaking and escape liability for injuries resulting from risks incident thereto;

That chapter 415 of the Laws of 1897, giving an employee who is injured while working on a scaffold by reason of some defect therein, a remedy against the master, has reference to a completed scaffold and not to one in the process of construction.

That the doctrine of *res ipsa loquitur* did not apply to the case;

That expert witnesses, who did not assume to state what was the proximate cause or causes of the accident, might properly state their conclusion as to the safety of the piles driven and as to the safety of that part of the scaffold not having X braces and cleats.

*Semble*, that a party, whose adversary offers expert testimony which is admitted over his objection, does not waive an exception, taken by him to its competency, by himself thereafter offering like evidence.

INGRAHAM and McLAUGHLIN, JJ., dissented.

APPEAL by the defendant, Edge Moor Bridge Works, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 5th day of June, 1900, upon the verdict of a jury, and also from an order entered in said clerk's office on the 6th day of June, 1900, denying the defendant's motion for a new trial made upon the minutes.

The action was brought to recover damages for the death of plaintiff's intestate, who was employed by the defendant, the Edge Moor Bridge Works, and was killed on April 11, 1899, by the collapse of a scaffold structure erected in the Harlem river. The theory of the complaint is that the defendant had negligently failed to provide a safe and suitable place for the plaintiff's intestate to work.

There is practically no dispute as to the method of construction

adopted in the erection of the scaffold, the case turning upon whether such method was reasonably safe. The defendant, it appears, was under contract to erect a steel bridge across the Harlem river, and stone piers were built, between which temporary scaffolds were constructed intended to support the steel girders, etc., and thereafter to be removed. Between the stone piers numbered 6 and 7, nine rows of piles parallel with the piers, seven to nine in a row, had been driven into the bed of the river. The piles were driven almost vertically and their tops were then forced as nearly as possible into line and upon them were placed two timbers, known as pile caps, which were bolted together and into the piles, thus forming a pile bent. At right angles to these pile caps were laid longitudinally timbers, called stringers, bolted to the pile caps and connecting the pile bents. There were three of these longitudinal timbers or stringers between each two bents, and the first bent from pier 7 was connected to the pier by stringers to a permanent bulkhead at the base of the pier. Upon each transverse pile bent were placed uprights and on their tops was another cap or timber, there being cleats or scabs fastened to the uprights and to the cross timbers or caps above to keep the uprights in place. The uprights appear to have merely rested on the beam below. Above the upper caps on the uprights upper longitudinal timbers or stringers were laid, bolted to the caps and connecting the uprights of each bent. On top of the upper stringers tracks were placed on which ran a traveler or crane, weighing thirty tons, which was used for hoisting timbers from below, and particularly for raising the upper bents, consisting of uprights with their cap bolted to them.

In addition, cross beams or braces were placed between the bents upper and lower, which were intended to strengthen the scaffold. These braces comprised " sway braces," which ran transversely, and " X braces," which ran longitudinally to the structure. At the time of the accident X braces had been provided for the bents near pier 7, but not for the seventh, eighth and ninth bents, and the traveler was resting above these latter bents. It had been gradually pushed along as the structure grew and was made to rest upon uncompleted scaffolding. It was not, however, in actual use when the accident happened.

At that time, the plaintiff's intestate, who had some experience in bridge and scaffold building, was at work in a boat below the traveler. He had been sawing piles off evenly and securing sash braces between them below the high-water line. There is no evidence that he had anything to do with the upper structure or knew that X braces had not been provided for the last three bents.

The defendant sought to explain the accident by showing that just prior thereto some workmen had drawn bolts from the stringers, thus breaking the chain of beams which reached back to the bulkhead. To rebut this the plaintiff introduced evidence that these workmen had denied having drawn any bolts. The plaintiff claimed that the proximate cause of the accident was faulty construction of the scaffold, because the piles were not properly driven, and it was necessary to force them into line, and because X braces and cleats were not provided for the bents above which the traveler rested.

At the conclusion of the case the issues were submitted to the jury upon a charge and written communication which stated : " The plaintiff alleges that the structure fell because of some defect in the piles themselves, in number or arrangement of them, or because of the lack or insufficiency of bracing, or because the uprights were not fastened to the pile caps, sometimes called sill beams, or because the derrick was too heavy for the structure to bear, or because of some, any or all of the above-mentioned reasons."

The jury returned a sealed verdict in favor of the plaintiff for $4,000, and from the judgment entered thereon and from the order denying the motion for a new trial, the defendant appeals.

*Carl A. De Gersdorff,* for the appellant.

*Thomas P. Wickes,* for the respondent.

O'Brien, J.:

The defendant upon this appeal contends that the judgment should be reversed, because (1) there was no competent evidence that the defendants had not exercised reasonable care to insure the safety of the structure or that the accident was caused by its negligence ; (2) the opinion evidence to the effect that the structure was unsafe was inadmissible ; (3) the plaintiff's intestate was himself engaged in erecting that part of the structure which fell, had full

knowledge of any defects which existed, and took the risk thereof; and (4) if there is any negligence in running the traveler out over the last bents without X braces and cleats, it was negligence in a detail of work for which defendant is not liable to an employee injured thereby.

The contentions presented involve not only the usual questions of defendant's negligence and plaintiff's freedom from contributory negligence, but, if these are resolved favorably to plaintiff, there are still the additional questions whether the collapse of the structure was a risk which the workman assumed and whether it was caused by the negligence of a co-employee in performing a detail of the work intrusted to him, for which negligence the master is not responsible. Whether the plaintiff, who was himself engaged in completing a part of the scaffold which fell, had knowledge of existing defects, was, we think, properly submitted to the jury as a question of fact. The risks which he assumed were only those apparent to observation or which, from the character of the structure, he was bound to observe and know. And, as well expressed in the head note in the case of *Davidson* v. *Cornell* (132 N. Y. 228), "where, however, although the defect is apparent, it may require skill and judgment not possessed by ordinary observers or by the servant, to give knowledge of hazards which may be apprehended therefrom, he does not assume those hazards." Here the plaintiff's intestate was an efficient laborer, but it does not appear that he was familiar with principles and methods of construction, and, not being thus skilled, he could not be charged, as matter of law, with knowledge of the condition of the piles, which for the most part were concealed in water and earth, and with driving which he had nothing to do, nor with knowledge of the effect of the presence or absence of particular braces in the superstructure.

Nor do we think, if the causes assigned by plaintiff for the accident, which we will hereafter discuss, were the true and proximate causes, that these were a mere detail of the work intrusted to a fellow-workman for which the master is not responsible. The latter was bound to exercise care in erecting the structure on or about which the employees were to work. We do not mean to be understood that in some cases the master may not employ persons, as in a hazardous undertaking, and escape liability for injuries resulting

from the incidental risks, but our remarks are addressed to the particular structure here in question which was not inherently dangerous, and which, if properly erected, would at all times have provided a place to work in which the employees would be reasonably safe. This duty of providing a place reasonably safe was imposed upon the defendant and could not be delegated.

Passing from the consideration of assumed risk and contributory negligence and negligence of fellow-workmen, we are brought to what we think is the real and most difficult subject before us, namely, whether there was sufficient and competent proof given at the trial to justify the submission to the jury of the question of defendant's negligence. The latter's theory of the cause of the fall of the scaffold — that it was due to workmen who drew certain bolts — was met by opposing evidence, and this question was properly submitted to the jury. The respondent insists that the verdict which found defendant negligent may be supported by the doctrine of *res ipsa loquitur* or by the failure of defendant to comply with the provisions of section 18 of chapter 415 of the Laws of 1897, which impose upon a master liability for neglect in constructing an unsafe scaffold. We think, however, that the statute which gives a remedy against the master in favor of an employee who is injured while working on a scaffold by reason of some defect therein, has reference to a completed scaffold. And, for a similar reason, we think that the doctrine of *res ipsa loquitur* does not apply because this scaffold was in course of erection, and from the mere falling of part of it alone, the inference of negligence cannot be drawn.

We must consider, therefore, the specific grounds of negligence alleged in the complaint, or of which proof was given at the trial, and from these conclude favorably or unfavorably to the appellant. As correctly summarized by the appellant, "the negligence particularly specified in the complaint, and which the plaintiff attempted to prove on the trial, was that the traveler ought not to have been run out upon the 7th, 8th and 9th bents," because the piles upon which the false work was supported were too weak for the purpose for which they were used, and were improperly driven, and because insufficient cross or X braces were used to connect the different bents, and the upper portion of each bent was insecurely fastened on the pile cap with cleats or scabs. In addition to such

charges of negligence, there was testimony given at the trial that at the time, " and a day or two before the accident, there was not timber there for X braces." There is other evidence in the case that the timber was there, so upon this point a disputed question of fact arose. Whether defendant was negligent in not providing material suitable for X braces was not submitted to the jury, the court limiting the negligence to the other charges above enumerated ; and we may, therefore, dismiss the question of whether or not sufficient and proper timber was supplied by the defendant from further consideration. So with respect to defective plans. Though such defect was alleged in the complaint and referred to on the trial, the questions relating thereto were, on plaintiff's request, withdrawn from the consideration of the jury.

Upon the question of whether the piles were sufficient for their purpose, it is admitted that they were not exactly plumb, and that the heads of some of them were pulled by lines from an engine into place in order to make a straight row upon which to bolt the pile caps ; and it appears that after the accident the piles which were under the traveler were found broken off short at the river bed. The principal evidence relating to the piles was given by experts, one of whom, Mr. Tate, was superintendent for defendant Rodgers, and on examination by plaintiff's counsel stated that "these piles were driven. * * * in the usual and ordinary way * * * in a workmanlike and proper manner," and " these piles were sufficient to support the weight of the false work and the traveler." This was nothing more or less than the opinion of an expert, which was the same kind of evidence that appellant insists it was error to admit. Objection was made to the expression of opinion by the other expert, Mr. Joyce, as to the safety of the piles for their purpose. This is not necessarily inconsistent, however, for the defendant had the right to object to plaintiff's using such evidence ; and when it was allowed, without waiving the exception to its competency, could rely upon like evidence.

The first of this opinion evidence was brought out by defendant's counsel in examining Mr. Rodgers, the contractor for the pile work, who stated, in answer to question, that from his large experience such piles as he saw were " driven in a proper and workmanlike manner." Opposed to this evidence is the testimony of Mr. Joyce,

who, as well as Mr. Tate, was skilled in bridge and scaffold building and worked on the structure in question. He testified that Mr. Mahon, who inspected the piles, had asked him to see the piles driven, and to give his opinion, and he told Mr. Mahon that they were not driven properly, exception being taken to the admission of this statement. He then testified that the drop of the hammer on the piles was ten to twelve feet and the piles went, under each of the final blows, from nine to ten inches. When asked what that indicated, he answered that the pile was too short. A motion was made to strike out the answer, which was denied. To the further statement that the usual distance to drop the hammer was at least thirty feet, exception was taken. He was then asked whether, as an experienced pile driver, the piles in his opinion were solid enough to construct upon; and, under exception, he answered that they were not.

The appellant further objects that the testimony of Mr. Joyce referred to piles which, as matter of fact, did not figure in the accident, because they were not under that part of the structure which fell; but the plaintiff could not be expected to give evidence as to the way in which each pile was driven. The method of driving the piles was determined when such work was begun, and it does not appear that after the first piles mentioned were driven, any material change was made in their selection or the manner of driving them. There is in evidence a letter from Mr. Rodgers directed to the appellant, and written before the accident, to the effect that "Mr. Tate is of the opinion that the piles 55' long as arranged for, are too short and is fearful that they are not solid enough to construct upon; but that they are now driving two extra piles under each bent for the purpose of adding strength to it. We can get piles 70 to 75 feet long. * * * " This letter, it seems, also referred to piles near pier 7; but another letter written by Mr. Headrick, who was in charge of the work for the appellant, indicated that thereafter little change was made. It is as follows: "I authorized Rodgers to drive piles as mentioned * * * in one bent only."

The introduction of these letters was objected to as irrelevant only, and we think the court was correct in holding that it would admit them "as evidence of the notice to the defendant of the facts stated, * * * but not as evidence of the truth of those facts. You must prove that the facts actually existed." This burden the plaintiff

subsequently undertook, and thereafter, upon the question of notice merely, the letters were admitted.

Upon the subject of insufficient bracing and support of the structure by cleats, the main facts are admitted, *i. e.*, that there were no cross or X braces between the last three bents at the time of the accident nor cleats. And it is admitted, also, that the traveler or crane weighing thirty tons was directly over such bents. Aside from the X braces and cleats, it appears that sway or transverse braces had been provided, and that the stringers had been bolted to each other, and the appellant contends that the structure thus built was sufficient to sustain the weight and strain to which it was subjected, and that the absence of the X braces and cleats had nothing to do with the accident which was caused by the withdrawal of bolts from the stringers by some of the workmen. It was shown that the original plans did not call for longitudinal X braces which were ordered as a precaution by the engineer in charge, and it is urged that the X braces were merely to provide against a lateral thrust presumably from the exterior and not to sustain vertical weight. In opposition, it is insisted by the respondent that without X braces and cleats, the use or presence of the crane on top of the scaffold would make and render the structure unsafe.

The witness Joyce, whose testimony as to the piles has been referred to, testified in reference to the erection of the superstructure, that the ninth, eighth and seventh bents or sections which fell, had no X braces or cleats, and that the traveler " was sent ahead out towards the middle of the river before the bracing was done underneath." He was then asked whether, in his opinion, the ninth, eighth and seventh bents were reasonably safe without the X braces and without the cleats which he had described. Objection to this question was overruled, and the witness answered, under exception, that they were not safe. The next question was, " In what manner ought the structure to have been constructed before the crane was put on ? " and exception was taken. The question was limited to the three bents, seven, eight and nine, and the answer was: " Those scabs ought to have been on, and those X braces ought to have been on from one bent to another to secure them in position and hold them." Asked if he knew what caused the collapse, he replied that he " could not answer either way."

Thomas W. Hildebrand also testified for plaintiff that he had been at work as a bridge builder twelve or thirteen years, and worked on the scaffold here in question, and that when the accident occurred there were no upper or lower X braces between the sixth and seventh, seventh and eighth, and eighth and ninth bents from one bent to another, and that the traveler was on the bents that fell, chained down to the sixth with the front end out near the ninth. He was then asked, "Was it usual to put on a traveler of this kind and stand it over bents that were not X braced one with another and that did not have X bracing between the legs of the bents and the sills on which they rested?" and answered, under exception, "No, sir." The next question was whether that was a reasonably safe way of constructing such false work, and he answered, under exception, that it was not. It will thus be seen that whether the method of construction adopted was safe and proper depended to a large extent on expert evidence, and we are thus brought to a consideration of whether or not such evidence was competent.

Opinions of experts may not be given if the facts on which they are based are such that men of ordinary experience and intelligence can draw the inferences therefrom without such aid. In Stephen's Digest of the Law of Evidence [Chase's 2d ed.] we find a summary taken from the case of *Harley* v. *Buffalo Car Mfg. Co.* (142 N. Y. 31) as follows: " A, an employee in B's machine shop, was injured by the breaking of a belt used to move machinery. The belt was fastened with a belt-fastener which gave way. A sued B for damages for this injury, alleging negligence. At the trial experts in the use of belts and fasteners were asked to state their opinion as to the safety and fitness of the kind of belt-fastener which caused A's injury. This evidence was deemed to be irrelevant. The main question at issue was whether the fastener was suitable and safe, and this should be determined by the jury and not by the opinions of experts."

This rule is expressed in *Van Wycklen* v. *City of Brooklyn* (118 N. Y. 424), wherein it was said as stated in the head note: " The opinion of a witness upon the precise question the jury is to determine, is only competent *when from the nature of the case* the facts cannot be stated or described to the jury in such manner as to *enable them to form an accurate judgment thereon*, and no better evidence than

such opinions is attainable." And in *Transportation Line* v. *Hope* (95 U. S. 297) the rule was well stated as follows: "It is upon subjects on which the jury are not as well able to judge for themselves as is the witness that an expert as such is expected to testify. Evidence of this character is often given upon subjects requiring medical knowledge and science, but it is by no means limited to that class of cases."

The most recent expression of the highest court of the State upon this subject is to be found in the case of *Dougherty* v. *Milliken* (163 N. Y. 527), wherein it is said (p. 533): "It may be broadly stated as a general proposition that there are two classes of cases in which expert testimony is admissible. To the one class belong those cases in which the conclusions to be drawn by the jury depend upon the existence of facts which are not common knowledge, and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority upon the subject. If, in such cases, the jury with all the facts before them can form a conclusion thereon, it is their sole province to do so. In the other class, we find those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases, not only the facts, but the conclusions to which they lead, may be testified to by qualified experts. The distinction between these two kinds of testimony is apparent. In the one instance, the facts are to be stated by the experts and the conclusion is to be drawn by the jury; in the other, the expert states the facts and gives his conclusion in the form of an opinion which may be accepted or rejected by the jury.

"The next step in the logical development of this inquiry is to ascertain to which of these two classes the case at bar belongs. If the knowledge of the experts consists in descriptive facts which can be intelligently communicated to others not familiar with the subject, the case belongs to the first class. If the subject is one as to which expert skill or knowledge can be communicated to others not versed in the particular science or art, only in the form of reasons, arguments or opinions, then it belongs to the second class. (*Fergu-*

*son* v. *Hubbell*, 97 N. Y. 507 ; *Roberts* v. *N. Y. El. R. R. Co.*, 128 N. Y. 455 ; *Schneider* v. *Second Ave. R. R. Co.*, 133 N. Y. 583 ; *Parish* v. *Baird*, 160 N. Y. 302 ; *Van Wycklen* v. *City of Brooklyn*, 118 N. Y. 432 ; *Schwander* v. *Birge*, 46 Hun, 66.) "

Following the rules thus given for our guidance, the question presented is in which of the two classes defined must the evidence objected to be placed. If in the first, requiring that the testimony should relate only to facts, then it was error to admit the opinions of experts which involved conclusions from facts; if in the second, which permits such opinions to be given, the exceptions are untenable. As stated, the opinions given related to the safety of the piles driven and to the safety of the scaffold without X braces and cleats. Upon the first subject the expert had testified that the hammer fell ten instead of thirty feet, and that at the final blows the piles went under nine or ten inches; and to further questions he answered, under exception, that that would indicate that the piles were too short, and were not safe to construct upon. The conclusion thus expressed was, we think, one which a layman, unskilled in pile driving, could not draw from the facts stated. A man of ordinary experience and intelligence could not form an adequate judgment whether piles which sank ten inches under a blow of a hammer falling ten feet were or were not safe to construct such a scaffold upon. It does not appear that any better evidence than the opinions of experts was attainable on this subject, and, therefore, it was proper to permit the question and the answer. This evidence falls, we think, in the second class referred to, and was properly admitted.

The other opinion evidence related to whether the structure without longitudinal X braces and without scabs or cleats to the uprights was reasonably safe for supporting the weight and strain to which it was subjected, *i. e.*, a thirty-ton crane at a particular place. Here, again, it is not certain that one not versed in the science and art of construction after a detailed statement of the facts, showing the manner of construction, could form an adequate judgment as to whether a scaffold so built was safe. To do so would require knowledge of the resistance of beams of which, as testified, the scaffold was built, the exact purpose and effectiveness of sway and X braces, and the composition and resultants of forces exerted by a thirty-ton traveler or crane at the end of a structure of a certain height and

length. The opinions of experts on this subject, though involving the statement of a conclusion, were, therefore, competent.

Cases holding that similar expert opinions are admissible are not wanting. One of these is *Littlejohn* v. *Shaw* (159 N. Y. 188), which held, as said in the syllabus, that " the quality and condition of gambier, an article imported for a particular purpose and requiring the existence of certain especial conditions in order that the grade of its quality and condition in the market may be determined, is within the rule which permits the introduction of the opinions of witnesses competent to speak upon the subject, when, from the nature of the subject, *facts disconnected from such opinions cannot be so presented to a jury as to enable them to pass upon the question with the requisite knowledge and judgment.*" And in *Moyer* v. *N. Y. C. & H. R. R. R. Co.* (98 N. Y. 645), an action for damages to lands alleged to have been caused by defendant's embankment, an expert was asked: " Are there any adequate causes in your judgment for this " (injury)? *Held*, that the question was proper as the inquiry " *assumed a hypothesis, the truth or falsity of which was left open to the jury ;* and then asked, *not* what caused the injury, but what were all the adequate causes which might have been its origin, leaving the jury to determine among them."

Here the experts not only did not assume, but refused to state what was the proximate cause or causes of the accident, and gave merely their opinions as to whether the structure without X braces and cleats was safe and secure. Whether such braces and cleats were omitted, whether such omission was negligence, and whether that negligence was the proximate cause, were ultimately questions of fact for the jury and were so submitted under the charge of the learned trial judge.

The case of *Moore* v. *Westervelt* (27 N. Y. 234) has a suggestive bearing as to opinion evidence. There the question was whether or not a vessel had been properly moored, and a witness, who had experience in mooring vessels, was asked: " What was the condition of the fastenings of this schooner as to safety?" and it was held that his opinion, as one possessing skill in such matters, was competent. More analogous is the case of *Baird* v. *Daly* (68 N. Y. 547) where the question in issue was the negligent sinking of a scow, and it was held that the defendant " should have been permitted to show

FIRST DEPARTMENT, DECEMBER TERM, 1900.        [Vol. 56.

\* \* \* that the scow was *unseaworthy;* that is, unfitted and *unsafe* for the service in which she was engaged. \* \* \* The jury were non-experts, and with every fact which would enable a skilled man to determine the question of seaworthiness, it by no means follows that *they* would make the proper inference and arrive at a correct conclusion. The witness should have been permitted to answer the question put upon this subject."

Upon this branch of the case, therefore, we think that the rulings of the trial judge in admitting the opinions of the experts are supported by authority.

With respect to the evidence given by Tate, we have the further question presented by the motion made to strike out his testimony upon the ground that he was not qualified to speak as an expert, and for that reason his opinion was improperly admitted. As a matter of fact, his testimony was not very material to the plaintiff, for an analysis of what he said will show that he never flatly stated that the absence of X braces and cleats in the false work rendered it reasonably unsafe. On the contrary, he distinctly held that the structure, if the stringers were bolted, was safe. It was difficult to get from him, under any assumption of facts, the statement that the scaffold was unsafe ; and, no doubt, from his relations with the defendant Rodgers, who employed him as superintendent and who was originally charged by the plaintiff with responsibility for the accident, there was a natural reluctance on his part to furnish evidence for the plaintiff. We should hesitate, therefore, where, as here, it appears that the evidence given could not have had a material bearing upon the result, to reverse a judgment which was otherwise supported by sufficient competent evidence.

If we assume, however, that his testimony was material, we think Tate was shown to be an expert and qualified by study and experience in his profession to give an opinion upon the subject under investigation. It is true that he stated he had never had experience in building this particular kind of false work; but it also appeared that he was a civil engineer and had had a four years' course of study as such at college and was a member of the Society of American Engineers ; that he had been engaged in working at his profession as a civil engineer for sixteen years ; and that he was the engineer employed by the defendant Rodgers as superintendent in

connection with the driving of the piles on this very structure, and, while so in charge of the work, noticed the manner in which the scaffold was being built and the absence of X braces. Although he had never been engaged in putting up a like structure, his familiarity with similar work, added to his special knowledge of this particular scaffold, gained from observation as it progressed, and his sixteen years' experience as a civil engineer, based upon a regular course of study, qualified him, in our opinion, as an expert, and his testimony, therefore, was, for what it was worth, properly admitted.

We are thus brought back to the consideration whether upon the whole case there was sufficient evidence to submit to the jury the question of defendant's negligence and plaintiff's freedom from contributory negligence.

In many of its features this case is strikingly analogous to that of *Davidson* v. *Cornell* (*supra*), from which we have already quoted. In that case, as correctly stated in the head note, " defendants were engaged in constructing an elevated railroad ; they used for this work a steam engine and apparatus placed upon a platform 'on wheels, which moved along, as the work progressed, upon girders resting upon crossbeams. While the platform was being moved forward the girders on which it rested gave way and the end of the platform fell to the ground. Plaintiff, an employe of defendants, at work upon the platform where he had been employed for some time previously, was injured. In an action to recover damages, plaintiff's evidence tended to show negligence on the part of defendants in not properly bracing the girders laterally or bolting them to the crossbeams."

In the case at bar the defendants were engaged in the erection of a large structure or scaffold, which measured over fifty feet in height above the bed of the river, fifty feet in breadth for seventy-five feet, and twenty-five feet in breadth for an additional twenty-five feet. It was surmounted by a traveler with a base fifty feet by twenty-eight feet, and a height of sixty-two feet, which brought its top one hundred and twelve feet above the bed of the river. This structure, made up of piles, beams, planks and braces, was much more complicated than that of the elevated railway, and though a trestle or scaffold, in fact was, in many particulars, like a large building, and when completed was expected to sustain a great weight, consisting

of the steel and iron girders which were to be used between the stone piers and form part of the permanent structure of the bridge. This scaffold was a method and means intended to support and for use in the placing and erection of the steel spans of the bridge.

The method employed was somewhat similar. In both instances, after providing for a support for the traveler, the latter was advanced to each new section or bent so as to enable it to hoist the material which was intended to be used in forming the next section or bent. The failure in the *Davidson* case to provide upon the elevated structure on which the traveler was advanced as the work progressed, lateral braces or support, and the failure to bolt the girders to the crossbeams, were the causes assigned for the accident, whilst here the main causes assigned were the absence of braces and cleats on the structure of the seventh, eighth and ninth bents or sections before advancing the thirty-ton traveler. Although in the *Davidson* case there was a reversal upon rulings on evidence, it was expressly held that the submission of the questions of negligence and contributory negligence to the jury was proper. In principle we do not think, upon facts, that the two cases can be distinguished. Both structures were in course of erection and not completed.

It is suggested, however, that there is a distinction between the two cases, growing out of the fact that in one the structure was intended for permanent, while in the other it was intended for temporary, use. Such a distinction we do not think sound. Both were intended to be completed structures; both were substantial; both were intended to sustain great weight, and the fact that one was not to be continued in use as long as the other does not seem to us to make a distinction in principle. The essential feature in *Davidson* v. *Cornell* was the fact that the structure was in course of erection, and that feature is present here. That case, therefore, is valuable not only in the way of argument, but as an authority, and we do not see why, upon the questions discussed and decided upon a state of facts nearly analogous, it is not controlling.

Upon the whole case, therefore, our conclusion is that the judgment should be affirmed, with costs.

VAN BRUNT, P. J., and HATCH, J., concurred; INGRAHAM and McLAUGHLIN, JJ., dissented.

INGRAHAM, J. (dissenting):

Upon the trial the complaint in this action was dismissed against the defendant Rodgers, and the jury found a verdict against the Edge Moor Bridge Works, appellant. The appellant had a contract to do the iron work of a bridge across the Harlem river known as the Willis Avenue bridge. The masonry piers had been built, and in order to erect the iron superstructure upon these piers the appellant caused to be built a timber structure which rested upon piles driven in the bottom of the river and extending from pier to pier. While this timber structure, which was to be used as a scaffold for the erection of the permanent iron structure, was in course of erection, it collapsed, and the plaintiff's intestate, who was engaged with other workmen in building this temporary structure, was killed.

It seems to me that the principle applied in cases where the master has failed to furnish for his workmen a safe scaffold for use in their work does not apply ; for here no scaffold was furnished, but the accident happened while the workmen were engaged in erecting a scaffold which when completed was to be used by the appellant's workmen in the construction of the permanent structure. The negligence charged against the appellant was that proper piles were not supplied to support this structure and that the structure was not sufficiently braced to sustain the weight of a traveler — which appears to have been a derrick which was run out on the temporary structure as it advanced, to raise the timber used for the erection of the temporary structure. The negligence claimed as to the piles was that they were too short and were not properly driven ; but the evidence shows, I think, that the accident was not caused by improper piles, as the piles themselves were broken off instead of being pushed out of position, which would have been the case if they had been improperly driven or not of sufficient length. There was evidence tending to show that the particular portion of the structure upon which this traveler rested at the time of the accident was not sufficiently braced, and that in consequence of this absence of bracing, the structure above the piles broke down ; and the question as I view it is, whether or not the appellant was liable because those in charge of the work attempted to proceed too fast by using this traveler before the structure had been properly braced.

An entirely different question would have been presented, it

seems to me, if this structure had been completed and the appellant had allowed its employees to use it when at work in constructing the bridge. That is the condition to which the case of *Davidson* v. *Cornell* (132 N. Y. 228) applied. The plaintiff who was there injured was employed in building a railroad, and the court in describing the accident says: " The structure, called the traveler, containing the engine, boiler and other appliances, was moved on the girders from one crossbeam to another, having the weight of ten to twelve tons, and required a substantial support. In this instance, for some cause, it is said, the girders swayed as the traveler was moving along upon them, and they, with it, fell to the ground. There was no lateral bracing placed between the girders before this weighty structure called the traveler was moved over them. Nor were the ends at the bottom bolted.  *  *  *  There was evidence tending to prove that the bracing would have added materially to the stability of the girders, to the support of the traveler, and to the safety of the employes engaged upon it; and that such bracing is usual in like cases in other work; also that bolting the girders at the bottom as well as at the top would have essentially aided in keeping them in the position in which they were placed. The conclusion was warranted that the situation in which the girders were when the platform conveying the engine, boiler and other implements was moved over them, was such as to be deemed in defective condition for such use and purpose." In that case the question of the defendant's liability does not seem to have been determined, as the case was reversed upon the question of evidence and a new trial was ordered. The only question that the court discussed, other than that upon which the judgment was reversed, was as to whether the plaintiff assumed the risks incident to the work that he was about to do, but this question was apparently not determined, the court saying: " Those (the risks) not obvious assumed by the employe are such perils as exist after the master has used due care and precaution to guard the former against danger. And the defective condition of structures and appliances which, by the exercise of reasonable care of the master, may be obviated, and from the consequences of which he is relieved from responsibility to the servant by reason of the latter's knowledge of the situation, is such as is apparent to his observation."

The late case of *Stewart* v. *Ferguson* (164 N. Y. 553) presents a case of a scaffold furnished by the master to his employees to work upon, and it was there held that sections 18 and 19 of the Labor Law (Laws of 1897, chap. 415) enlarge the duty of the master or employer and extend it to responsibility for the safety of the scaffold itself, and thus for the want of care in the details of its construction, but sections 18 and 19 of the Labor Law apply only to a scaffold furnished or erected for the performance of labor in the erection, repairing, altering or painting of a house, building or structure. Here the plaintiff with other workmen of the appellant was engaged in erecting the scaffold, and it was because of a collapse of the scaffold in the process of erection that the accident happened ; and what was said in *Kimmer* v. *Weber* (151 N. Y. 420) would seem to me to apply to this case. There the scaffold was being constructed. " The crosspieces, or some of them, seem to have been heavy pieces of timber, and on the day of the accident two of the workmen were engaged in putting one of these timbers in place. While so engaged one of the men let fall the end of the heavy timber that he was holding and it crushed by its sudden fall and broke one of the crosspieces of the plumbers' scaffold. This caused the whole scaffold to fall, resulting in the injury and death of the plaintiff's intestate. The accident was evidently caused by the neglect of the workmen who were handling the timber or by some defect in the crosspiece of the plumbers' scaffold. If the accident is to be attributed to the act of the workmen who were engaged in putting the timber in place, there is nothing in the case to show that the defendants are liable for the misconduct. They were co-servants, and nothing appears to charge the defendants with negligence either in employing them originally or in retaining them. It is not suggested that the judgment can be upheld on such grounds." The court, further discussing the relation of the plaintiff's intestate to the other employees, stated : " The master is not responsible for the negligent performance of some detail of the work intrusted to the servant, whatever may have been the grade of the servant who executes such detail. If it is the work of the servant and he volunteers to perform it, and the master is not at fault in furnishing proper materials, there is no breach of duty on

the part of the latter." This seems to me to present the exact case now before us. The plaintiff's intestate was engaged in the construction of this scaffold. Other employees of the appellant who were his fellow-workmen were engaged with him in the erection of this scaffold. By their negligence this traveler was placed upon a portion of the structure not sufficiently braced, and in consequence of that negligence the structure gave way and the plaintiff's intestate was killed. It seems to me that this was the negligence of a fellow-servant and not the negligence of the master, and for that reason I do not think that the appellant can be held liable.

McLAUGHLIN, J. (dissenting):

I dissent. The principal question litigated upon the trial was whether or not the scaffold which collapsed was properly constructed. The appellant was not bound to furnish the best-known scaffold, but only such as was reasonably fit and safe, considering the nature of the work to be done upon it — one such as a man of ordinary prudence would construct and use, having regard to his own safety if he were to do individual work upon it. (*Harley* v. *Buffalo Car Mfg. Co.*, 142 N. Y. 31.)

As already said, the principal fact litigated was whether the appellant had performed its duty in constructing the scaffold and brought itself within the rule alluded to, and, as bearing upon this question, opinions of several witnesses offered on the part of the plaintiff were taken against the objection and exception of the appellant. Thus, one witness was permitted to testify: " Q. Now, I ask you, in your opinion as an experienced pile driver, whether the piles were solid enough to construct upon ? * * * A. They were not. * * * Q. Mr. Joyce, were the 9th, 8th and 7th bents reasonably safe, in your opinion, without the X braces which you have described, and without the cleats or scabs which you have described ? * * * A. It was not safe." And another witness was asked, " Was it usual to put on a traveler of this kind and stand it over bents that were not X braced, one with another, and that did not have X bracing between the legs of the bents and the sills on which they rested ? * * * A. No, sir. Q. Was that a reasonably safe way of constructing such false work ? * * * A. No, sir, it was not."

To enable the jury to determine whether the appellant was guilty of negligence in the construction of the scaffold, it was proper and competent for the plaintiff to prove in detail the way it was constructed, the strain to which it was subjected, the weight placed upon it, and its liability to break by reason of such strain and weight, as well as the experience of persons who had constructed and used similar scaffolds; in other words, the construction and strain, by reason of the use of the scaffold, could all be laid before the jury, and after a fair and full consideration of such facts it could determine whether or not the appellant had performed its duty. It certainly did not aid it in the discharge of such duty to permit a witness to say that it was not properly constructed or that the scaffold was not safe, because those are questions which must be determined from the facts, and not from the conclusion of a witness no matter how learned or skilled he might be in the construction of scaffolds. The exceptions taken to the admission of this testimony were well taken, and for the errors thus committed I think the judgment should be reversed and a new trial ordered.

Judgment affirmed, with costs.